**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

PEARLETTE MERRIWEATHER;

Case No.: 1:26-cv-02520

Plaintiff,

Hon.

v

CITY OF MUSKEGON HEIGHTS;
LASHAE SIMMONS, in her individual and official capacity;
DERRICK COLLINS, in his individual and official capacity;
WILLIAM KITCHEN, in his individual and official capacity;
TE SMITH, in his individual and official capacity;

Defendants.

---

Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
Attorneys for Plaintiff
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
eric@delaportelynch.com
gina@delaportelynch.com

---

## COMPLAINT

NOW COMES Plaintiff Pearlette Merriweather (hereinafter "Ms. Merriweather"), by and through her attorneys at Delaporte Lynch, PLLC, and files her Complaint against the City of Muskegon Heights, Lashae Simmons, Derrick Collins, William Kitchen, and Te Smith for Defamation, violation of Ms. Merriweather's Federal and State Constitutional rights to Due Process, Violation of Ms. Merriweather's Liberty Interest in her Good Name, violation of MCL 15.363 *et seq*. ("Whistleblower Retaliation"), Termination in Violation of Public Policy, and False

Light. Plaintiff seeks compensatory, exemplary, and punitive damages, attorney's fees, and costs for the violations of her rights as protected under federal and state laws.

VENUE AND JURISDICTION

1. Defendant City of Muskegon Heights (hereinafter, "the City"), is a Michigan governmental entity situated entirely in Muskegon County, Michigan, in this Honorable Court's territorial jurisdiction.
2. During all material times, Defendant Lashae Simmons (hereinafter, "Defendant Simmons"), was a Councilperson for the City of Muskegon Heights.
3. During all material times, Defendant Derrick Collins (hereinafter, "Defendant Collins"), was a Councilperson for the City of Muskegon Heights.
4. During all material times, Defendant William Kitchen (hereinafter, "Defendant Kitchen"), was a Councilperson for the City of Muskegon Heights.
5. During all material times, Defendant Te Smith (hereinafter, "Defendant Smith"), was an attorney for the City of Muskegon Heights.
6. This Honorable Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiffs asserts a federal due process claim.
7. This Honorable Court maintains supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because such claims arise from the same set of facts as the federal claim.
8. Venue is proper pursuant to 28 U.S.C. §1391 because all of the acts complained herein occurred within the boundaries of this Honorable Court's territorial jurisdiction.
9. Plaintiff's requested monetary relief exceeds $25,000.00.
10. Thus, legal jurisdiction and venue are proper in this Honorable Court.

## FACTS

*Background*

11. Plaintiff incorporates the previous paragraphs as if contained herein.

12. Ms. Merriweather was previously appointed as the Interim City Manager for the City of Muskegon Heights (hereinafter, "the City").

13. On or around August 13, 2025, Ms. Merriweather was appointed the Interim City Manager and signed a contract for this position that outlined her responsibilities, authority, and employment with the City.

14. Under this contract, Ms. Merriweather was responsible for executive administration, personnel oversight, departmental coordination, public relations, and municipal operations.

15. The contract further stated that Ms. Merriweather was to act "in accordance with applicable law" and Ms. Merriweather may be terminated for "violation of law."

16. Soon after beginning her employment with the City, Ms. Merriweather became aware of some financial concerns.

17. On or about September 2025, Ms. Merriweather began noticing blanket purchase agreements with little factually detailed invoices that were directed to the City attorney, Te Smith, (hereinafter "Defendant Smith").

18. Ms. Merriweather reported her suspected violations of law to Mayor Bonnie McGlothin, expressing concern that the Seventeen Thousand ($17,000), monthly rate did not align with the Michigan Bar Association 2023 Salary Survey, given Defendant Smith's minimal experience in municipal, administrative, and government law.

19. Deputy Finance Director Brenda Eilers informed Ms. Merriweather that Defendant Smith was paid via a blanket purchase agreement consisting of a single-page document with the date and payment amount for electronic transfer.
20. Ms. Merriweather kept raising her suspicions that there were violations of law.
21. On or about October 6, 2025, Councilmembers became aware of Ms. Merriweather's concerns regarding Defendant Smith's payment.
22. Before the October 6 meeting adjournment, Defendant Williams stated, "Please remit payment to the attorney [Defendant Smith] as soon as possible, the finance committee does not convene or vote on the attorney payments, the council does not vote on the attorney payment."
23. On or about February 2026, Ms. Merriweather emailed Defendant Smith stating January 2026 invoice lacked sufficient detail to process payment.
24. Ms. Merriweather included an example of a previous invoice Smith submitted for Downtown Development Authority work as a sample of what would suffice as a proper invoice format.
25. Rather than providing the requested documentation directly to Ms. Merriweather, Defendant Smith contacted members of the City Council seeking their intervention to instruct Ms. Merriweather to pay his invoice.
26. Ms. Merriweather firmly held that the City had an obligation to ensure proper invoices and documentation before distributing public funds.
27. Throughout the next few months, Ms. Merriweather spoke with Mayor Bonnie McGlothin, Mayor Pro Tem Kellie Kitchen, and Councilman Ronald Jenkins about her

concerns regarding billing practices and the City's oversight of Defendant Smith's activities.

28. On or around March of 2026, Ms. Merriweather emailed Defendant Smith regarding invoices and his demand for immediate payment.

29. In that email, Ms. Merriweather explained the need for the City to comply with standard accounting principles and contracting legal standards for inspection and acceptance of goods and services.

30. In response to Ms. Merriweather's email, Defendant Smith responded (including council members on the email), stating that Ms. Merriweather's behavior was unacceptable and that accounting and contract law principles were not the standard.

31. Following this exchange of emails, on or about April 27, 2026, Defendant Simmons delivered a lengthy tirade accusing Ms. Merriweather of being the issue, stating "it was not a problem until she got here."

32. Simmons made a motion for "City Manager to pay the City Attorney without questions."

33. In addition to Ms. Merriweather's concerns regarding Defendant Smith's invoices, Ms. Merriweather also expressed concern about the use of Senior Millage Funds.

34. On or around December 2025, Darryl Todd submitted an invoice for snow removal services under the Senior Millage Program, totaling $3,500.00 for services allegedly rendered in December 2025.

35. The invoice charged seven seniors on four different occasions for one hundred and twenty-five dollars ($125.00), per removal.

36. During routine review her monthly invoices, Ms. Merriweather identified the questionable nature of Darryl Todd's invoice for snow removal services under senior millage program.
37. Ms. Merriweather suspected that the services either had not been completed or were significantly overcharged.
38. Consequently, Ms. Merriweather asked Chief Maurice Sain of the Muskegon Heights Police Department to investigate the invoice discrepancies.
39. In February 2026, Police Chief Sain assigned the matter to Detective Radcliff.
40. Chief Sain reported that the initial investigation found some senior residents stated they neither requested snow removal service nor received the service.
41. Chief Sain referred the inquiry to the Elder Abuse Taskforce housed in the Norton Shore Police Department, citing a presumed conflict of interest arising from a prior lawsuit involving Chief Sain or his family with Darryl Todd as the reason for referral.
42. Detective Jared Paschier of Norton Shore Police Department contacted Ms. Merriweather regarding the investigation.
43. On or about March or April of 2026, Detective Paschier confirmed Chief Sain's findings and added that Carolyn Cook, Director of Senior Millage program, refused to speak without Union representation.
44. Ms. Merriweather spoke with Detective Paschier, who informed her the case was closed.
45. On July 2, 2026, Detective Paschier told Ms. Merriweather that, per his supervisor, he was only allowed to provide her with the police report/complaint number.
46. After demonstrating success in her position as Interim City Manager, on or about April 27, 2026, the Board voted Ms. Merriweather into the permanent City Manager role.

47. Similar to Ms. Merriweather's insistence on legal compliance and financial documentation while she was Interim City Manager, Ms. Merriweather continued to question financial decisions that seemed vague or violative of law.

48. Prior to Ms. Merriweather's tenure as City Manager, Defendant Collins and Defendant Simmons participated in a sealed bid for foreclosed real estate owned by the city.

49. Both of their bids were two to three times less than the highest bidder, and despite not being the highest bidders, Defendants Collins and Simmons won the bids for the foreclosed real estate.

50. Defendant Collins served as chair of Building and Lands Committee, and Simmons was also a committee member.

51. Following winning the bids for foreclosed real estate owned by the city, Mayor Bonnie McGlothin, while acting as City Manager, signed and executed a deed to Councilman Derrick Collins for a piece of property.

52. Mayor McGlothin stated she relied on Defendant Smith, acting as the City Attorney, to ensure all paperwork was proper before signing.

53. During Ms. Merriweather's tenure, she learned there was no purchase agreement for the property deeded to Defendant Collins.

54. Following Ms. Merriweather's discovery, Defendant Collins communicated via email that he would no longer take care of the property unless he received a transfer of deed.

55. Ms. Merriweather opposed the transfer of the deed to Defendant Collins, citing that there was no proof that Defendant Collins had purchased the property.

56. In May of 2026, Ms. Merriweather spoke with Mayor Pro Tem Kellie Kitchen about the deed transfer matter.

57. Mayor Pro Tem Kitchen informed Ms. Merriweather that Defendant Collins contacted her to assist with effectuating the transfer of deed.

58. Defendant Collins told Mayor Pro Tem Kitchen that he did not have the bill of sale or proof of purchase, stating that the document was at his son's house, but his son had since moved, and the document could not be found.

59. Despite a two-year lapse since the bidding, Defendants Collins and Simmons continued working to obtain the properties, and sales of properties stalled.

60. Defendant Collins requested the Council to vote to sell all real estate property as a whole instead of individually to ensure that both Defendants Simmons and Collins would receive the properties they wanted.

61. In addition to Ms. Merriweather's opposition of suspected violations of law regarding property sales, Ms. Merriweather also reported to the City Auditors, specifically Paul Matz of Rehmann, potential fraud, waste, and abuse of overtime in multiple City departments.

62. Ms. Merriweather reported that Fire Chief Shawnderick Robertson's overtime exceeded double his $90,000 salary.

63. Ms. Merriweather reported that the Department of Public Works regularly abused overtime, including opening and closing public bathrooms off regular hours, to receive three hours of pay at a time-and-a-half rate.

64. Ms. Merriweather reported that water emergencies (and associated overtime), decreased after water activities were removed from Director Guy Khi and Anthony Bradford's control.

65. Expanding on the suspected fraud in the Department of Public Works, despite the City receiving $2.4 million in 2024 and over $2 million in 2025 for road repair and maintenance, the City Department of Public Works has no record of any significant road repair or activities.

66. Given this, Ms. Merriweather raised concerns around April or May of 2026 over the poor road conditions, and she instructed Brenda Eilers (Deputy Finance Director), and Khi Guy (Department of Public Works Director), to collaborate on a plan of action for street repair and maintenance.

67. Director Guy submitted a plan, but it did not reflect the expected level of knowledge in project management or budgeting for his position.

68. Ms. Merriweather informed Director Guy that he would present information on the road budget and plans to repair/maintain the City's streets at a town hall for the public on June 18, 2026.

69. Then, during the first week of June 2026, Director Guy informed Ms. Merriweather via email that he would not participate in the town hall, and he simply refused without an explanation.

70. The planned June 18, 2026, road repair plan presentation to Muskegon Heights residents did not occur.

71. Ms. Merriweather raised concerns over several months regarding the state of operation within the Department of Public Works.

72. Particular violations of law Ms. Merriweather presumed within the Department of Public Works included: (1) DPW worker misuse of city vehicles (via GEOTab monitoring review), (2) Abuse of overtime, (3) Conduct of DPW worker, (4) Poor condition of

roads, (5) Poor condition of DPW main work facility, and (6) Director Guy's qualifications to hold his position.

73. Ms. Merriweather and Mayor Pro Tem Kellie Kitchen conducted an inspection of the Department of Public Works during March of 2026 in connection with these suspected violations of law.

74. Following all of the above outlined instances where Ms. Merriweather reported suspected violations of law, on June 8, 2026, during a regularly scheduled City Council meeting, Defendant Simmons made a privileged motion to immediately remove Ms. Merriweather from the City Manager position.

75. Four Councilmembers voted in favor of the motion, and Ms. Merriweather was immediately escorted from the building.

76. Without discussion or a supporting rationale for Ms. Merriweather's termination, the Council appointed Fire Chief Shawnderick Roberson as the new City Manager.

77. Following Ms. Merriweather's retaliatory termination, on June 9, 2026, Defendant Kitchen made the following defamatory remarks regarding Ms. Merriweather on 103.7 Radio and Facebook Live:

    a. "[Ms. Merriweather] opened the door to bring the State Treasury to co-op or to absorb into our income tax department" – Kitchen

    b. Ms. Merriweather failed to meet her promise to set up recreation activities. – Kitchen

    c. Ms. Merriweather had "taken off the table" the forensic audit –Kitchen

78. The following day, the Council planned a special meeting, but it was canceled due to lack of quorum.

79. Instead of departing the chamber because of the lack of a quorum, those who had gathered turned the proposed meeting into a press conference.

80. Defendant Kitchen attended via Zoom; Defendant Simmons, Defendant Collins, and Defendant Smith were physically present.

81. Mayor Bonnie McGlothin stated to news outlets WOOD TV 8 and/or WZZM TV 13 that she did not call for the special meeting and knew nothing about it.

82. During this impromptu press conference, Defendant Simmons and Defendant Collins stated to WOOD TV 8:

    a. "It's my understanding that approximately $450,000 in city funds was spent without prior council approval;" – Simmons

    b. "Simmons said the funds involved a reimbursement that was taken from savings and never returned;"

    c. "Unfortunately, as of today and the conversation with finance it did not return to where it was supposed to be;" – Simmons

    d. "[Derrick] Collins echoed many of Simmons' concerns. Collins said he and Simmons received multiple complaints regarding Merriweather's leadership and management style."

    e. "Since I mentioned it, … that person got scolded for telling me by the person that was released on Monday;" –Simmons

    f. "90% of city staff expressed concerns regarding her manager and leadership style;" –Collins

83. Defendant Simmons continued to disseminate additional defamatory remarks about Ms. Merriweather, including statements to WZZM TV 13:

a. "She [Lashae Simmons] cited a non-specified $450,000 expenditure without council approval that was never refunded as a key reason." – Simmons

b. "The contract states that anything over $5,000 must come to the Council. It did not come to the Council. So, you are what? In breach of contract. So being in breach of contract, we have to make some decisions;" – Simmons

c. "Tomorrow, when Councilman Collins has his finance meeting and I sit on that committee, we are going to go through those papers, and we are going to find out the real information." – Simmons

84. As a result of Defendants' retaliatory and defamatory conduct, Ms. Merriweather has suffered emotional distress and significant damage to her reputation.

85. Wherefore, Plaintiff states the following Counts against Defendants:

<u>COUNT I</u>

*Defamation*
*As to All Defendants*

86. Plaintiff incorporates the previous paragraphs as if contained herein.

87. The elements of a defamation claim are: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. *Mitan v Campbell*, 474 Mich 21, 24 (2005).

88. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Sarkar v Doe*, 318 Mich App 156, 178 (2016).

89. With respect to a public figure, the defamatory statement must also have been made with "actual malice." *Edwards v Detroit News, Inc*, 322 Mich App 1, 12 (2017).

90. A statement is made with "actual malice" when the publisher knows that the statement was false, or made the statement with reckless disregard of whether it was false or not. *Milkovich v Lorain Journal Co*, 497 US 1, 14 (1990).

91. Defendants made defamatory statements about Ms. Merriweather when they distributed false information suggesting that Ms. Merriweather expended $450,000 without prior council notice, along with the Defendants' other remarks to local news outlets.

92. Defendants' slanderous claims concerning the circumstances of Ms. Merriweather's termination were not a fair and true representation of Ms. Merriweather's actions, and such claims contained clearly false information that Ms. Merriweather committed violations of law.

93. Defendants knew or should have known that their statements during their secret meeting with the press were false, as there was no evidence that Ms. Merriweather had engaged in any financial misconduct

94. Defendants were acting outside of their official capacities when they made defamatory statements about Ms. Merriweather because the statements were not made while Defendants were in Council meetings and Defendants were speaking as individuals.

95. Defendants' statements were made to third parties (i.e., multiple press outlets, including WOOD TV 8, WZZM TV 13, and on Facebook Live).

96. Defendants' statements were intentional, made with actual malice, negligence, and/or reckless disregard for the truth.

97. Defendants' defamatory statements were defamation per se, and thus, damages are presumed; nonetheless, Defendants' statements caused Ms. Merriweather to suffer profound damages, including, but not limited to, mental suffering, emotional distress, embarrassment, and humiliation, significantly harming Ms. Merriweather's professional and personal life.

98. WHEREFORE, Plaintiff respectfully requests this Honorable Court award her the legal and equitable relief set forth in the Relief Requested section of this Complaint as permitted by applicable law.

## COUNT II

*Violation of Procedural Federal*
*Due Process and Violation of State Due Process*
*under the Michigan Constitution Article I § 17 as to all Defendants*
*Through the Vehicle of 42 U.S.C. § 1983*

99. Plaintiff incorporates the previous paragraphs as if contained herein.

100. Under 42 U.S.C. § 1983, a person acting on behalf of the State who causes a citizen of the United States to be deprived of any rights, privileges, or immunities secured by the Constitution shall be liable to that party at law.

101. The Fourteenth Amendment prohibits the State from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV.

102. The Michigan Constitution likewise prohibits the State from depriving any person of life, liberty, or property without due process of law.

103. Defendants deprived Ms. Merriweather of her liberty and property interest in her position as City Manager without due process of law when she was abruptly terminated.

104. Defendants further denied Plaintiffs due process by denying her notice of the accusations against her, notice of her impending termination, and an opportunity to be heard prior to her termination.

105. As a result of this violation of Due Process, Plaintiff has suffered severe economic and non-economic damages, as well as emotional distress.

WHEREFORE, Plaintiff respectfully requests this Honorable Court award her the legal and equitable relief set forth in the Relief Requested section of this Complaint as permitted by applicable law.

## COUNT III

*Violation of Plaintiff's Constitutional Liberty Interest in her Good Name*
*As to All Defendants*

106. Plaintiff incorporates the previous paragraphs as if contained herein.

107. Defendants falsely stated that Ms. Merriweather expended $450,000 in City funds without Council knowledge or approval.

108. These false statements were published to the public online, via news articles and Facebook Live.

109. Defendants acted intentionally or grossly negligently in publishing these false statements about Ms. Merriweather.

110. Defendants were acting outside of their official capacities when they made these statements about Ms. Merriweather because the statements were not made while Defendants were in Council meetings and Defendants were speaking as individuals.

111. As a result of Defendants' defamation, Ms. Merriweather has suffered both economic and non-economic damages, including but not limited to barriers to

professional advancement resulting in lost future opportunities, wages, and benefits, damage to her reputation, and severe emotional distress.

WHEREFORE, Plaintiff respectfully requests this Honorable Court award her the legal and equitable relief set forth in the Relief Requested section of this Complaint as permitted by applicable law.

## COUNT IV

*Violation of the Whistleblower Protection Act – Retaliation*
*As to All Defendants*

112. Plaintiff incorporates the previous paragraphs as if contained herein.

113. Plaintiff can establish a violation of Michigan's Whistleblower Protection Act ("WPA") claim by demonstrating that (1) she engaged in a protected activity; (2) she was discharged, threatened, or otherwise discriminated against; and (3) there was a causal connection between the employee's protected activity and the defendants' retaliatory action. *Henderson v. City of Flint*, 751 Fed. Appx. 618, 619 (6th Cir. 2018).

114. Under the WPA, there are three types of protected activity: '(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation.'" *Henderson v. City of Flint, Michigan*, 751 F. App'x 618 (6th Cir. 2018) (citing to *Kuhn v. Washtenaw County*, 709 F.3d 612, 629 (6th Cir. 2013).

115. Ms. Merriweather engaged in activity protected by the WPA when she reported suspected fraudulent activity to the officials within the City, a public body.

116. Ms. Merriweather was terminated, threatened, and discriminated against when the City terminated her employment as the City Manager.

117. The temporal proximity between protected activity and the threatening and/or discriminatory action "helps to establish an inference of retaliation;" however, if temporal proximity is insufficient to establish a causal connection, then evidence of the plaintiff's declining relationship with the defendant suffices. *See*, *Id*. at 626.

118. There is a causal connection because the City's termination of Ms. Merriweather's employment occurred shortly after Ms. Merriweather's protected activity of reporting suspected violations of law to the City.

119. Further, there is a causal connection because there was a declining relationship between Ms. Merriweather and Defendants, evidenced by the contentious emails between Defendant Smith and Ms. Merriweather regarding Defendant Smith's invoices.

120. As a result of this unlawful retaliation, Plaintiff has suffered severe economic and non-economic damages, as well as substantial emotional distress.

121. WHEREFORE, Plaintiff respectfully requests this Honorable Court award her the legal and equitable relief set forth in the Relief Requested section of this Complaint as permitted by applicable law.

## COUNT V

*Termination in Violation of Public Policy (Plead in the Alternative)*
*As to All Defendants*

122. Plaintiff incorporates the previous paragraphs as if contained herein.

123. Ms. Merriweather was working for the City when she reported suspected fraudulent activity (violations of law), to the City.

124. After receiving notice of these suspected violations, the City terminated Ms. Merriweather from her employment in retaliation for reporting these violations.

125. The City's conduct in terminating Ms. Merriweather violated public policy because it discourages employees from reporting illegal activities.

126. As a result of the City's discharge of Ms. Merriweather, Ms. Merriweather has suffered both economic and non-economic damages.

WHEREFORE, Plaintiff respectfully requests this Honorable Court award her the legal and equitable relief set forth in the Relief Requested section of this Complaint as permitted by applicable law.

## COUNT VI

*False Light*
*As to All Defendants*

127. Plaintiff incorporates the previous paragraphs as if contained herein.

128. Under Michigan law, a false light claim requires that "the defendant must have known of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Found. for Behavioral Res. v. W.E. Upjohn Unemployment Tr. Corp.*, 332 Mich. App. 406, 410 (2020).

129. Plaintiff can establish a false-light claim by establishing "that when the defendant disseminated the information, it was done with actual knowledge or reckless disregard of the truth or falsity of the publicized matter." *Id.*

130. Defendants' dissemination of untrue information to multiple news outlets painted Ms. Merriweather in a false light that her termination was caused for reasons other than the City's pretextual retaliation for engaging in protected activity.

131. Defendants knowingly and/or recklessly disseminated information that portrayed Ms. Merriweather in a false light when they reported untrue statements to multiple news

outlets that Ms. Merriweather expended $450,000 in City funds without prior Council approval.

132. Defendants were acting outside of their official capacities when they made these statements about Ms. Merriweather because these statements were not made while Defendants were in Council meetings and Defendants were speaking as individuals.

133. Defendants' actions were done with the intent of harming Ms. Merriweather's reputation and placing her in a false light that is highly offensive to a reasonable person.

134. Ms. Merriweather suffered damages as a result of Defendants' actions, including, but not limited to, emotional distress and damage to her professional reputation.

WHEREFORE, Plaintiff respectfully requests this Honorable Court award her the legal and equitable relief set forth in the Relief Requested section of this Complaint as permitted by applicable law.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays that this Honorable Court does the following:

a. Find that Defendants are liable for defamation.

b. Find that Defendants violated Ms. Merriweather's Federal and State Constitutional rights to Due Process.

c. Find that Defendants violated Ms. Merriweather's Constitutional liberty interest in her good name.

d. Find that Defendants violated the Whistleblower Protection Act by retaliating against Ms. Merriweather for reporting Defendants' violation of law.

e. Find that Ms. Merriweather was terminated in violation of public policy.

f. Find that Defendants are liable for false light.

g. Award to Plaintiff all appropriate compensation, fines, and penalties against Defendants available under law.

h. Award Plaintiff her attorney fees and costs.

i. Provide any other relief to Plaintiff that this Honorable Court deems fit.

Respectfully submitted,

Dated: September 4, 2026

Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
Attorneys for Plaintiff
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
eric@delaportelynch.com
gina@delaportelynch.com

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

PEARLETTE MERRIWEATHER;

Case No.: 1:26-cv-02520

Plaintiff,

Hon.

v

CITY OF MUSKEGON HEIGHTS;
LASHAE SIMMONS, in her individual and official capacity;
DERRICK COLLINS, in his individual and official capacity;
WILLIAM KITCHEN, in his individual and official capacity;
TE SMITH, in his individual and official capacity;

Defendants.

---

Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
Attorneys for Plaintiff
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
eric@delaportelynch.com
gina@delaportelynch.com

---

**JURY DEMAND**

In accordance with Fed. R. Civ. P. 38, the Plaintiff formally demands a trial by jury.

Respectfully submitted,

Dated: September 4, 2026

Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
Attorneys for Plaintiff
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
eric@delaportelynch.com
gina@delaportelynch.com